## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **RONALD JAMES RYAN &** | ) | **Case No.  03-04278-TLM** |
| **LOTTE SUE RYAN,** | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | **MEMORANDUM OF DECISION** |
| **KAREN RASMUSSEN,** | ) | |
| **individually and dba** | ) | |
| **SATELLITE CONNECTIONS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | **Adv. Case No. 04-6007-TLM** |
| | ) | |
| **RON RYAN & LOTTIE RYAN,** | ) | |
| **individually and dba** | ) | |
| **A-1 SATELLITE SERVICES** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

Ronald and Lotte Ryan, doing business as A-1 Satellite Service

("Debtors"), filed a voluntary chapter 7 petition November 21, 2003, commencing

Case No. 03-04278-TLM.  Upon Debtors' motion, the case was converted to

chapter 13 on February 11, 2004.  Unable to confirm a plan, Debtors re-converted

to chapter 7 on September 8, 2004.

MEMORANDUM OF DECISION - 1

Prior to the first conversion, Karen Rasmussen ("Plaintiff") timely filed a complaint on January 12, 2004 against Debtors, commencing this adversary proceeding. Adv. Doc. No. 1. Plaintiff asserts her claims against Debtors are nondischargeable on the basis of fraud, fraud or defalcation while acting in a fiduciary capacity, and/or willful and malicious injury. *See* § 523(a)(2), (4), and (6).[1] Plaintiff subsequently amended her complaint to include objections to discharge under § 727(a)(2), (3), (4), and (5).[2]

Trial on all the § 523(a) and § 727(a) issues commenced February 9, 2006. Following presentation of certain of Plaintiff's evidence, Debtors moved for judgment on partial findings pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52(c) incorporated thereby, arguing Plaintiff had not presented a prima facie case that she held a creditor claim against Debtors. Adv. Doc. No. 58 (minute entry). The motion was denied by an oral ruling February 10, and the trial continued. Adv. Doc. No. 59 (minute entry).

Following conclusion of the trial, Debtors filed a motion to reopen the evidentiary record. Adv. Doc. No. 63. The Court denied Debtors' motion and

---

[1]  All citations herein are to Title 11, U.S. Code, as it existed before enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"), because the instant case was filed prior to BAPCPA's effective date(s).

[2]  *See* Adv. Doc. Nos. 5, 6, 14, 17. Debtors objected to Plaintiff's motion for leave to amend their complaint. Adv. Doc. No. 10. The Court overruled Debtors' objection and allowed Plaintiff's amendment. Adv. Doc. No. 14. Debtors' subsequent appeal to the Bankruptcy Appellate Panel was dismissed. Adv. Doc. No. 26.

MEMORANDUM OF DECISION - 2

Plaintiff's responsive sanction request.  Adv. Doc. Nos. 72, 73.

The Court has evaluated all the evidence, with particular attention to the credibility of the witnesses.  It also takes judicial notice of the filings in Debtors' chapter 7 case.  Fed. R. Evid. 201, 801(d).  Having considered this record, the parties' legal arguments and applicable authorities, the Court enters here its findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052.

## II.    FACTS AND BACKGROUND

The parties have been in relatively constant litigation since 2001, first in state court and now in bankruptcy court.  Enmity between them is deep, and has to a degree even affected their counsels' behavior toward one another.  The testimony at trial was highly conflicting and contradictory.  Each side alleges the other's testimonial evidence was at best suspect and, at worst, perjurious.  The disputes flow from what appears to be a poorly planned and poorly executed business endeavor.

### A.    In the beginning

At the time of the events at issue in this case, Ronald and Lotte Ryan did business as sole proprietors under the name of A-1 Satellite Service ("A-1"), selling and installing home Direct Broadcast Satellite ("DBS") television systems.  Ronald Ryan ("Ryan") oversaw the day-to-day operations.[3]

---

[3] Lotte Ryan did not testify, and no evidence was presented regarding any direct involvement by her in the business, though she was a co-owner.

MEMORANDUM OF DECISION - 3

Plaintiff started working for Ryan in June 1998 as a dispatcher.[4]  During the summer of 2000, Plaintiff held informal talks with Ryan about starting her own company to solicit sales for A-1, feeling she could outperform Ryan's other salespersons.  To get her business going, Plaintiff proposed buying an autodialer[5] from one of Debtors' subcontractors, David Levy ("Levy"), for $50,000.00.  Plaintiff's then-boyfriend, Douglas Winn ("Winn"), agreed to provide $10,000.00 for the down payment.  Plaintiff's talks with Ryan soon became more serious.

**B.     The meeting at Murphy's**

In early September 2000, Plaintiff, Ryan, Ryan's bookkeeper April Buis, now April Hamilton ("Hamilton"), Winn and Ryan's employee Greg Hamilton all met at Murphy's Restaurant in Boise.  After discussing Plaintiff's business idea, a conceptual - but never documented - deal was struck.  Its general terms were:

1.      Plaintiff would purchase Levy's autodialer and related equipment for $50,000.00.  Winn would lend Plaintiff $10,000.00 for the down payment.[6]

---

[4]  A "dispatcher" in this context refers to the person who lines up people to actually install satellite television systems that have been sold to customers by salespersons or solicitors. A-1 employed both salespersons and dispatchers.  Ryan characterized the installers as "subcontractors," and appeared to feel some of the salespersons were as well.

[5]  The parties never clearly explained what an autodialer is.  It is apparently a telemarketing system, combining hardware and software, capable of making hundreds of sales calls per day.  *See, e.g.*, http://www.usautodialer.com.  The particular autodialer Plaintiff sought to purchase from Levy had eight "stations," meaning eight people could solicit sales simultaneously.  As addressed later in this Decision, the equipment Plaintiff purchased also included some furniture and fixtures.  Exs. 1, 2.

[6]  It was not clear whether the terms for the payment of the $40,000.00 balance were determined at the meeting.  As discussed below, the contract Plaintiff and Levy signed provided

(continued...)

MEMORANDUM OF DECISION - 4

2.      Ryan would assist Plaintiff in financing the business.[7]

3.      Ryan would pay Plaintiff a commission for each "installed sale" generated

for A-1 by Plaintiff's new business, which she would call Satellite

Connections.[8]

4.      Any money expended by Ryan to pay for Satellite Connections' bills would

be reimbursed from (effectively deducted from or accounted against)

Plaintiff's commissions.  Any commissions earned above and beyond

expenses would go to Satellite Connections.[9]

5.      Hamilton, Ryan's bookkeeper, would also handle Plaintiff's books and

keep track of all installed sales generated for A-1 by the autodialer, and of

---

(...continued)
that the balance would be paid in $10,000.00 monthly installments.

[7] The duration, extent, timing and details of Ryan's pledged assistance are at issue, but the fact he offered some financial backing, including fronting payment when Plaintiff lacked earned net income, is not.

[8] An "installed sale" is a sale that actually leads to an installation of a satellite system by A-1. At trial, there was adamant disagreement about the size of Plaintiff's commission, but it is uncontroverted she would be entitled to one. Plaintiff testified she was to be paid a commission for each sale, whether it was installed or not. The Court does not give the assertion much weight, because it makes little economic sense due to the fact Ryan himself did not get paid unless he actually installed a DBS system. Furthermore, both Ryan and Hamilton testified Plaintiff was to be paid per installed sale. Notwithstanding this disagreement, the terms "sale" and "installed sale" will be used interchangeably throughout the rest of the opinion to indicate a sale that lead to revenue for A-1, and thus Satellite Connections.

[9] At one point in her testimony, Plaintiff indicated she would receive the full amount of her commissions, and would not be responsible at all for reimbursing Ryan for out-of-pocket expenses related to Satellite Connections. She later changed her testimony, stating her commissions were to first cover her operating expenses, with any remaining amounts to be paid over to Satellite Connections. Plaintiff's lack of command of the pertinent facts in this case is problematic and is discussed again later.

MEMORANDUM OF DECISION - 5

Plaintiff's expenses and commissions.

Plaintiff claims Ryan agreed to pay her a $50.00 commission for every sale she generated for A-1. Ryan testified Plaintiff's commission started at $30.00 for each installed sale, and increased to $40.00 sometime in November, 2000.

Plaintiff also claims Ryan agreed to cover all of Satellite Connections' expenses, including autodialer payments, for three months. However, she did not contend Ryan would have any further obligation to her or Satellite Connections after the first three months. Furthermore, Plaintiff never testified that Ryan would have an ownership interest in her business or the autodialer. Plaintiff referred to Satellite Connections as "my" business several times in her testimony, and never claimed Ryan had joint control of its management.

Ryan testified he only agreed to "help" front payment of expenses, though he never explained the extent of his agreement. He was adamant that he never agreed to make Plaintiff's autodialer installment payments to Levy. He also denied his financial commitment was to last for three months. In fact, Debtors, in their post-trial briefing, characterized the relationship as being at will. Adv. Doc. No. 67 at 18. Ryan made it clear throughout his testimony he expected Plaintiff to establish Satellite Connections as a separate and self-sufficient business.[10]

---

[10] It appears from the whole of the evidence that Satellite Connections would be a trade name for Plaintiff's sole proprietorship, and that no separate entity was anticipated. This was essentially the approach Ryan took to his business operation as well.

MEMORANDUM OF DECISION - 6

Hamilton and Plaintiff testified that, based on a $50.00 commission rate, the autodialer would have to generate 100 sales per week to cover the anticipated operating expenses of the new business, including the monthly autodialer payments. Plaintiff testified she was confident she could meet that number. Indeed, Plaintiff projected the autodialer would generate 150 weekly sales by October or November, and eventually 200 a week.

Plaintiff and Hamilton testified they never conducted any detailed projections of Satellite Connections' operating expenses before coming up with the 100-sales-per-week benchmark. It remains unclear under the evidence how they arrived at that number or concluded it would generate a positive cash flow.[11]

### C.     The autodialer

On September 15, 2000, Plaintiff entered into a written agreement with Jeff Johnson[12] and Levy to purchase certain described "Telemarketing Equipment" for $50,000.00. Exs. 1, 2. This equipment included the autodialer system, as well as telephones, headsets, computers, software and office furniture. *Id.*[13] Plaintiff,

---

[11] If Plaintiff's business made 100 sales per week (or about 430 per month) and received $50.00 for each one, her monthly gross income would have been $21,500.00. Plaintiff apparently assumed operating expenses would not exceed $11,500.00 per month, since she also had autodialer debt service of $10,000.00 per month.

[12] Apparently, Levy owed Johnson money for the equipment, therefore Johnson was a party to the contract.

[13] References at trial, generally, were to the "autodialer" even though the contract included other equipment. The Court's use of the term autodialer in this Decision will similarly reference all the equipment sold in the contract.

MEMORANDUM OF DECISION - 7

using Winn's loan, paid $10,000.00 down, and agreed to make additional monthly payments of $10,000.00, starting October 15, 2000, until the autodialer was paid off.  Although not part of the written agreement, Levy agreed to train Plaintiff on the autodialer's use.  The autodialer was delivered sometime around September 15, 2000.  Plaintiff testified she was up and running within a few days.

### D.    Ryan "helps" with Plaintiff's business

Aside from purchasing the autodialer, it appears Plaintiff did very little to establish Satellite Connections as a business, such as creating separate bank accounts, establishing tax identification numbers, arranging for workers' compensation coverage or directly hiring employees.  Plaintiff did sign a lease for office space on September 8, 2000.[14]  *See* Ex. 3.  She testified she "hired" employees, although it appears Plaintiff's employees were on A-1's payroll.

It was uncontroverted that Ryan covered all of Plaintiff's operating costs, including rent, payroll, insurance, utilities, and phone charges.  In addition, Ryan provided Plaintiff with a $600.00 weekly draw.  Ryan eventually made two autodialer payments as well, including a late fee.  Ex. X.

Plaintiff concedes Ryan spent $91,649.00[15] covering Plaintiff's business

---

[14]  The address of the space Plaintiff leased was "208 E. 37th #10."  A-1's address at the time, according to its records, was 200 E. 37th #9.  *See* Ex. 11.

[15]  This includes $65,499.00 in unitemized business expenses.  It also includes $6,150.00 for Plaintiff's weekly draws, and two $10,000.00 autodialer payments.  It does not include the $1,000.00 late fee Ryan paid for the October installment.

expenses from September to December, 2000. Adv. Doc. No. 60 at 3.

Debtors did not advance a number of their own, but their post-trial brief indicates a similar amount. Based on Debtors' assertions, Plaintiff's operating costs from October 1 to December 18, 2000 would have totaled about $67,000.00. If one then adds the two $10,000.00 autodialer payments, and a $1,000.00 late fee, A-1's total expenditures for Satellite Connections, per Debtors' briefing, approach $88,000.00. The total would increase to $94,000.00 if Plaintiff's weekly draw is added, something Debtors' briefing does not make clear.[16]

As this discussion illustrates, it was difficult for the parties to reach firm positions on the financial facts. This was due in large part to a lack of organized and reliable records to corroborate their positions.

### E.    Friction begins

By early October, trouble started to brew. Winn pressed Plaintiff for a promissory note evidencing the debt she owed him for the autodialer down payment. A note dated October 2, 2000 was drafted. Ex. B at internal Ex. A.

---

[16] Debtors' briefing relies, oddly perhaps, on Plaintiff's financial statement prepared for a loan application which shows operating expenses of $75,144.49 between October 1 and December 1, 2000. *See* Ex. 86. That total included a payroll for Satellite Connections of $51,645.89 but testimony at trial indicated that number was inflated, and that Satellite Connections' payroll, *i.e.*, the employees paid by A-1 but working "for" Plaintiff, was never more than $14,000.00 per month. Based on that assertion, Satellite Connections' payroll between October 1 and December 1 was closer to $28,000.00. When that is added to the other operating expenses listed on the financial statement, the total costs are $51,498.60 or $858.31 per day over the 60-day period. Extending the per-day number out to December 18 brings estimated total operating costs to $66,948.18.

MEMORANDUM OF DECISION - 9

Plaintiff signed it on November 16, 2000.[17]

Plaintiff started having difficulties with Ryan as well, especially around October 15 – the deadline for the first autodialer installment. According to Ryan, Plaintiff said she would either get the $10,000.00 from Winn or obtain a loan to cover the payment. Neither occurred. Ryan finally paid Levy on October 26, 2000, as well as a $1,000.00 late fee on November 17, 2000. Ex. X. Ryan also made the November installment. *Id.* Ryan testified he made the payments because Levy threatened to repossess the autodialer, and Ryan wanted to avoid that result. Not only did Ryan think the autodialer could become profitable, the operation was, at that time, being used to generate sales for A-1.

Meanwhile, Plaintiff's efforts to make Satellite Connections a stand-alone business continued to move slowly. Plaintiff still had not obtained an employer identification number or insurance policies needed to cover the business and its workers. Plaintiff did not even open a business checking account until November 29, 2000 with an initial deposit of $100.00. Ex. 89.

Around mid-November, in an effort to boost Satellite Connections' revenues, Ryan testified he recommended Plaintiff hire more employees to staff the autodialer. Ryan also testified that, at Winn's suggestion, Dennis Hurlbert was brought in as a manager for Satellite Connections. Ryan testified he also agreed to

---

[17]  Plaintiff testified Winn later obtained a judgment against her for defaulting on the note.

raise Plaintiff's commission to $40.00 per installed sale.[18]  Plaintiff maintains her commission was always $50.00.

Hamilton testified Plaintiff and Ryan had many arguments during October and November.  When asked if any of those arguments related to Plaintiff's allegedly low sales volume, Hamilton testified she did not recall, even though she admitted being within earshot of several encounters.  Ryan's testimony indicated there was definite friction with Plaintiff, brought on by her high expenses, low sales, and inability to establish Satellite Connections as its own business.  Plaintiff testified she had no disagreements whatsoever with Ryan until December.[19]

Plaintiff testified she was consistently generating between 125 and 150 sales per week, exceeding the 100-sale-per-week benchmark discussed at Murphy's.  Notwithstanding this testimony, Plaintiff admits she applied for a Small Business Administration ("SBA") loan in early December.  Hamilton helped prepare a financial statement for this application that indicated Plaintiff's business accounted for 1,349 sales between October 1 and December 1, 2000, or between 150 and 160 sales per week.  Ex. 86.  There is no explanation or corresponding records to corroborate this number, nor was the statement dated.

---

[18]  Ryan testified he increased Plaintiff's commission by $10.00 because his own commission was increased by $10.00 starting in late October.  *See* Ex. 11.  This lends support to Debtors' and Hamilton's testimony that Plaintiff was to be paid per *installed* sale.

[19]  Plaintiff did testify, though, that there was growing uneasiness because A-1 could not keep up with the sales volume Satellite Connections generated.

MEMORANDUM OF DECISION - 11

Those 1,349 sales generated $67,455.00 in revenues, according to the statement, indicating its preparer used a $50.00 commission rate.[20]  The same document showed Plaintiff had $0.00 in total liabilities, despite the fact she owed money to Levy and Winn for the autodialer, and had recently purchased a truck. *Id; see also* Ex. A, ¶ 13.  The financial statement also listed total "Operating Expenses" of $75,144.49.  As indicated, *supra*, that figure may have contained inflated payroll figures.  It also did not include the two autodialer payments Ryan made in October and November, and it is unclear whether it included Plaintiff's weekly draw.  Ryan testified he agreed to co-sign the loan application notwithstanding these known inaccuracies.  The loan was ultimately rejected.

**F.    Access to the books**

Plaintiff testified that another source of friction was her exclusion from Satellite Connections' own business records.  Plaintiff claims she constantly asked Hamilton to see the books.  Winn, in an affidavit prepared for state court litigation between these parties, says he asked "repeatedly" to see the numbers.  Ex. B at ¶ 14.  Hamilton testified she always found excuses to put them off.  She claims this was a directive from Ryan, who considered the books to be his, and off limits to Plaintiff.

Winn states in his affidavit he eventually examined the autodialer records

---

[20]  $67,455.00 divided by 1,349 sales equals just over $50.00 per sale.

MEMORANDUM OF DECISION - 12

to determine how many sales Satellite Connections generated.  *Id*. at ¶ 17.  Based on those records, Winn claimed, Plaintiff's business had earned $280,000.00 in commissions.[21]  However, the autodialer records produced for trial show Satellite Connections accounted for just 1,264 installed sales between early October and late December.  *See* Ex. D at internal Ex. B (hereinafter "autodialer records").

In addition to saying she kept Plaintiff's records secret, Hamilton also testified she falsified two of her own prior written accounts of Plaintiff's actual sales: (1) the financial statement prepared for the SBA loan, and (2) a ledger she prepared for a later state court lawsuit.  *See* Ex. 86; Ex. D at internal Ex. A (hereinafter "ledger").  When asked what Plaintiff's sales *really* were, Hamilton testified only that Plaintiff's business generated 98% of all A-1's installed sales during the three months Satellite Connections was in operation.  When asked how she arrived at that percentage, Hamilton testified she was there and saw the numbers as the data came through.  Neither she nor Plaintiff offered corroborating documentation to support this estimate.

---

[21]  The Court gives little weight to Winn's assertion in his affidavit that at some point in November "the sales Satellite Connections had generated should have resulted in about $280,000 [in] commissions."  Ex. B at ¶ 17.  While the parties agreed to the affidavit's consideration, the Court is entitled to determine the weight to be given this testimony.  *See* Adv. Doc. No. 59 (minute entry).  The Court did not have the ability to view demeanor and determine credibility.  In addition, the amount asserted, using a $50.00 commission, means Plaintiff's autodialer would have been responsible for 5,600 sales in less than two months.  This is far in excess of the 1,349 sales over two months asserted in Ex. 86.  Both Winn's numbers and the SBA financial statement numbers are in excess of Plaintiff's own testimonial estimate of up to 150 sales per week.  There really is no reason to consider Winn's assertion as probative.

MEMORANDUM OF DECISION - 13

### G.    The December 18, 2000 confrontation

On or around December 18, 2000, Levy informed Ryan the December autodialer payment was late.  Upon hearing this, Ryan confronted Plaintiff in her office.  The exchange was heated.  Ryan's frustration was compounded by his discovery that Plaintiff had received information in the mail from DirecTV about becoming a licensed installer.  Essentially, this would allow Plaintiff to compete against A-1, receiving commissions straight from DirecTV.  Ryan admitted this was an "irritation," but said he was mostly concerned about the late autodialer installment.  Ryan admits he grabbed Plaintiff by her shoulder during this confrontation and argument, demanding she make the autodialer payment.  Plaintiff called the police, who cited Ryan for battery.[22]

After speaking with the authorities, Plaintiff testified she left the scene to consult a lawyer.  Ryan testified that following the confrontation, he told Levy he would make no more payments on the autodialer.  At some point later on, Ryan says Levy removed the autodialer from Plaintiff's office space and took it home.

Hamilton, who was at Plaintiff's office at the time, disputes this testimony.  She testified Ryan told all of Satellite Connections' employees to move the autodialer and themselves to A-1's nearby location.

Plaintiff claims she returned about 45 minutes after she left to find her

---

[22]  Ryan testified he was convicted on the charge, paid a $500.00 fine, received one year probation, and was required to complete an anger management course.

MEMORANDUM OF DECISION - 14

offices bare of all equipment.  Plaintiff testified she called the authorities again, this time to report a theft.  According to her state court affidavit, she told police Levy was responsible for taking her equipment.  Ex. A at ¶ 18.  According to Plaintiff, the authorities told her it was a civil matter, and no arrest was made.

### H.    The aftermath

Plaintiff had her attorney draw up a letter dated December 19, 2000.  It was addressed to Levy, and accused him of unlawfully removing the "Telemarketing Equipment" on December 18.  Ex. 8.  This letter also states Plaintiff was "ready, willing and able" to make the $10,000.00 payment once the autodialer was returned to Plaintiff's offices.  *Id*.  A copy of a $10,000.00 check, with Winn's signature, made out to Levy and dated December 15, 2000 was attached.  *Id*.

Within days, if not hours, of the December 18 events, Levy and Ryan entered into negotiations for Ryan to purchase the autodialer.[23]  However, they did not reach an immediate agreement.  In fact, Ryan testified he, Levy, Plaintiff and Winn met at a local Texaco station on December 21, 2000, to talk about the autodialer.  According to Ryan, Levy wanted the December payment before he would return it, but Winn and Plaintiff wanted the equipment before they would remit payment.  Apparently neither side would budge, so the meeting ended without resolution.  Ryan's testimony about this meeting was not contradicted.

---

[23]  Ryan testified Levy called continuously to arrange such a deal.  According to Ryan, all Levy was interested in was getting the rest of his money for the autodialer.

MEMORANDUM OF DECISION - 15

Soon after the Texaco meeting, Ryan and Levy came to an agreement.  Ryan would pay Levy $20,000.00 for the autodialer, and Levy would again solicit sales for A-1, evidently as an employee.

In March or April of 2001, a fire broke out at A-1's offices, damaging the building and some of its contents.  Ryan testified the autodialer incurred water damage, but was still functional.[24]  Hamilton testified a "black book," in which she kept track of Plaintiff's sales, was missing following the fire.

Despite the turmoil of the final three months of 2000, Debtors' tax returns for that year show their business had sizeable revenue growth.  Debtors reported gross receipts of $653,898.00 on Schedule C of their 1040.  Ex. 10.  That's more than triple their 1999 gross receipts of $192,601.00.  Ex. 9.  Records show Debtors brought in more than $326,000.00 between early October and December 21, 2000. Ex. 11.  Debtors' 2000 gross profits increased about $100,000.00 over the previous year, but the 2000 net profit was nearly the same as 1999.  Exs. 9, 10.

### I.    State court lawsuit

Plaintiff filed suit against Debtors, Hamilton and Levy in state court in January 2001.  In April, 2001, Hamilton submitted an affidavit in the case favorable to Debtors.  Ex. D.  In it, Hamilton stated Plaintiff and Ryan's agreement in September called for a $30.00 commission.  *Id.* at ¶ 5(c).  She

---

[24]  In January, 2001, Ryan moved A-1's operations to a new building.  By the time of the fire, he had also purchased two additional autodialers.

MEMORANDUM OF DECISION - 16

indicated Plaintiff had access to her records on a daily basis.  *Id.* at ¶¶  17, 24.

Hamilton also accused Plaintiff of giving her inflated sales numbers (*i.e.*, 1,349

sales) to use in the financial statement submitted for the SBA loan.  *Id.* at ¶ 25.

To corroborate the latter statement, Plaintiff attached the ledger and

corresponding autodialer records which credited Plaintiff with 1,264 sales between

early October and late December 2000.  The ledger showed Plaintiff's revenues

and expenses, including a weekly breakdown of her sales volume.  At trial in the

present adversary, Hamilton testified she arrived at the 1,264 sales by consulting

source documents.  That included the autodialer records, which documented each

Satellite Connections' sale, the employee responsible for the sale, and the date the

installation was made.  Hamilton testified she made her best effort at the time to

insure the accuracy of those numbers.  As will be discussed more fully,

Hamilton's testimony is not above reproach.  However, the autodialer records and

corresponding ledger entries were the only documented evidence offered at trial

that tracks installed sales produced by the autodialer and Satellite Connections.

### J.      Hamilton switches sides

Though Hamilton signed an affidavit favorable to Debtors in the state court

action, she had a change of heart.  In May, 2003, Hamilton wrote a letter to the

judge in that case, stating in part:

> After resent [*sic*] events, I can not [*sic*] in good consciousnesses [*sic*]
> be a part of the defense of Ron Ryan.  The plaintiff in this matter has
> contacted me on several occasions in the past 6 months.  According to

MEMORANDUM OF DECISION - 17

> Miss Rasmussen, she was unaware that I was even named as a
> defendant. I believe that all parties need to talk for if I am forced to
> testify, the outcome will not be favorable for Mr. Ryan. The truth will
> be told. As an employee, I felt obligated to be loyal to Mr. Ryan and
> proceeded to do whatever he asked concerning this lawsuit. I am more
> interested in doing the right thing now.

Ex. 100.

At trial in the instant proceeding, Hamilton testified the "recent events" alluded to in the letter concerned her arrest for stealing money from an account on which Ryan was a signatory. Hamilton stated she gave false testimony in her state court affidavit to conceal her illegal activities, and to stay in Ryan's good graces. Although Hamilton says she lied then, she claims to be telling the truth now.

## III.    DISCUSSION AND DISPOSITION

Plaintiff alleges Debtors are liable for breach of contract, conversion, intentional interference with business relations, breach of fiduciary duty created by Plaintiff and Debtors' joint venture, lost profits, consequential damages, prejudgment interest, attorneys fees and costs. Plaintiff alleges the debt(s) thus owed her are nondischargeable pursuant to § 523(a), and also contends that Debtors discharge should be denied pursuant to § 727(a).

Before addressing the legal issues presented, some comments must be made regarding credibility standards and the Court's conclusions on that issue.

### A.    Credibility generally

In weighing credibility, the Court must examine a witness' testimony in

MEMORANDUM OF DECISION - 18

light of all the evidence presented.  It must evaluate all aspects of the witness'

testimony including evasiveness, selective recall, variations in demeanor, or

changes in tone of voice.  *See Anderson v. City of Bessemer*, 470 U.S. 564, 575

(1985).  The Court can assess credibility based not just upon the content of the

testimony but also the Court's own experience with the way people act.  *Maynard*

*Sav. Bank v. Banke (In re Banke)*, 275 B.R. 317, 328 (Bankr. N.D. Iowa 2002).  It

has long been held that the "touchstone" of credibility is the quality of testimony,

not the quantity.  *Weiler v. United States*, 323 U.S. 606, 608 (1945).

There are credibility concerns with each of the three primary witnesses.[25]

### 1.    April Hamilton

April Hamilton obviously has credibility problems.  She admits giving false

affidavit testimony in regard to the precise matters now at issue.  There are

additional concerns.

Despite being the bookkeeper for A-1 and Satellite Connections, and

having prepared two written accounts of Plaintiff's sales (Ex. 86, and Ex. D at

internal Ex. A), Hamilton now contends that the sales shown therein were not

accurate, and estimates that Plaintiff's autodialer resulted in 98 percent of A-1's

installed sales from October to December 2000.  Hamilton offers nothing to

---

[25] Other than Winn *via* his affidavit, Ryan, Hamilton and Rasmussen were the only witnesses.

MEMORANDUM OF DECISION - 19

support this opinion, other than the fact that she saw the sales come through.[26]

Plaintiff argues Hamilton's inability to corroborate her conclusions is a result of Ryan's conduct, or from the fire after which Hamilton's "black book" was missing. Plaintiff also discounts the contrary written accountings because Hamilton now admits she earlier lied to benefit Ryan.

Hamilton's prior conduct evidences a willingness to vouch for the truthfulness and accuracy of knowingly inaccurate information. Even considering the alleged reasons why she did so, and considering Hamilton's letter to the state court, much doubt remains. This affects not just Hamilton's testimony about the number of Plaintiff-generated sales, but also her testimonial descriptions of the meetings, the terms of the arrangement between Plaintiff and Ryan, and even the events of December 18, 2000.

### 2.    Plaintiff Karen Rasmussen

Plaintiff's testimony cannot be given much weight when it comes to her own assertions of sales volume, or her claim that she was barred from seeing her business records.

Plaintiff claims she never saw her books because Ryan refused to allow her

---

[26] Even Plaintiff's counsel does not seem particularly convinced of Hamilton's 98% approach. He offers yet another way to figure Plaintiff's sales, based on some statistical assumptions, that is only slightly less speculative than Hamilton's "98%" theory. *See* Adv. Doc. No. 60 at 15.

MEMORANDUM OF DECISION - 20

access to this information.[27]  Despite this alleged handicap, Plaintiff insisted at trial she (or, rather, the several employees working the autodialer), logged between 125 and 150 sales per week.  She does not cogently explain how she reaches a credible estimate without access to data.

Additionally, before switching sides in this litigation, Hamilton testified in her state court affidavit that at one point, Plaintiff was checking Satellite Connections' records on a daily basis.  Ex. D. at ¶ 17.

Plaintiff also presented a financial statement in conjunction with the SBA loan that credited Satellite Connections with 1,349 sales as of December 1, 2000.  Ex. 86.  Plaintiff did not persuasively explain how she could be completely in the dark about her company's financial condition, and yet attach a financial statement to a signed bank loan application, that among other things credited Satellite Connections with 1,349 sales in a two-month period.

In short, Plaintiff appears willing to assert, as fact, matters regarding the number of sales she made without corroboration or a logically consistent explanation of the underlying circumstances.

---

[27]  There is an overarching concern here.  Plaintiff was a party to an oral agreement that, she alleges, contemplated paying her a commission per sale and required a given number of sales for her to break even.  The deal, she says, had Ryan fronting the payment of operating expenses, with the same being deducted from her earned commissions.  That she would tolerate a situation where she had no ongoing accounting for the number of sales, the amount of the commission credited per sale, or the actual expenses paid by Ryan that were deducted against her earned commissions is incredulous.  This is especially hard to believe since Plaintiff had incurred a sizeable purchase obligation on the autodialer and would need to document and account for all the business activity on her 2000 taxes.

MEMORANDUM OF DECISION - 21

Plaintiff also testified she had no disputes or arguments with Ryan between October and December 18, 2000, despite ample testimony by Hamilton and Ryan to the contrary. Finally, Plaintiff made an uncorroborated claim that the real problem was the fact that Satellite Connections was generating more sales than Ryan could handle.[28]

All in all, Rasmussen's testimony on these matters is contradictory, unsupported by documentation, and at times simply not believable.

### 3.    Defendant Ron Ryan

Ryan's credibility is not without problems either. His lack of clear and reconcilable financial documentation is a source of consternation, and certainly impacts the weight to be given his testimony. There is no single record or set of records that contemporaneously track sales and expenses under the inexplicably undocumented "deal" with Plaintiff. Even the most reliable information concerning Plaintiff's sales - the autodialer records and corresponding ledger - were gathered after Plaintiff and Debtors parted company. The Court is left with a disorganized mass of documents that either lack foundation or clear meaning.[29]

---

[28]  The autodialer records (Ex. D at internal Ex. B), and particularly A-1's records of commissions it received on installed sales (Ex. 11) are inconsistent with the assertion that A-1 could not keep up with the sales generated by Satellite Connections. The assertion appears especially suspect in light of Plaintiff's own estimate of 150 sales per week.

[29]  Among other things, Ryan did not make clear why or even how he expected Plaintiff to pay Levy directly the $10,000.00 installments if he was in control of all her commission income, and not providing Plaintiff with either cash (except $600.00 weekly draws) or accountings.

MEMORANDUM OF DECISION - 22

Many are contradictory, including the SBA loan application Ryan testified he endorsed and supported.  Furthermore, the records Debtors rely on are not easily reconciled with their tax returns much less their assertions in the bankruptcy schedules and statements.

Finally, Ryan does not thoroughly explain what actually happened on December 18, 2000, after the verbal and physical confrontation with Plaintiff. From the Court's ruling on the Fed. R. Civ. P. 52(c) motion, Debtors knew the issue of conversion was dependent on the facts surrounding Ryan's alleged assertion of dominion over the autodialer.  But his testimony that Hamilton's version was wrong, that Levy took the autodialer, and then later (within days) sold it to Ryan, is vague and uncorroborated.

None of the three primary witnesses fare particularly well.

### B.    Objections under§ 727(a) and § 523(a)

#### 1.    Generally

Objections to discharge under § 727(a) are strictly construed against plaintiff creditors, and liberally in favor of debtors, in order to effectuate the policies underlying the Bankruptcy Code.  *Sterling Int'l, Inc. v. Thomas (In re Thomas)*, 03.3 I.B.C.R. 178, 181 (Bankr. D. Idaho 2003); *Palmer v. Downey (In re Downey)*, 242 B.R. 5, 12-13, 99.4 I.B.C.R. 165, 168 (Bankr. D. Idaho 1999); *McVay & Corrigan, A.P.C. v. Barnetche (In re Barnetche)*, 98.2 I.B.C.R. 37 (Bankr. D. Idaho 1998); *see* 6 Collier on Bankruptcy ¶ 727.01[4] at 727-12.1, n.36

MEMORANDUM OF DECISION - 23

(Alan N. Resnick & Henry J. Sommer eds., 15th rev. ed. 2005) (citing *Consumers Oil Co. v. Adeeb (In re Adeeb)*, 787 F.2d 1339 (9th Cir. 1986)). "The reasons for denial of a discharge must be real and substantial rather than technical and conjectural." Collier, ¶ 727.01[4] at 727-12.1 (citing *Commerce Bank & Trust Co. v. Burgess (In re Burgess)*, 955 F.2d 134 (1st Cir. 1992)). This accepted standard recognizes loss of discharge is one of the most substantial sanctions that can be levied by this Court. Even though complaints are strictly construed against objecting creditors, the burden of proof for creditors with such complaints is a preponderance of the evidence. *Downey*, 242 B.R. at 13, 99.4 I.B.C.R. at 168 (citing *Grogan v. Garner*, 498 U.S. 279, 284 (1991)).

Similarly, exceptions to discharge under § 523(a) are strictly construed against the objecting creditor and in favor of the debtor. *Spokane Ry. Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 475 n.5, 00.4 I.B.C.R. 199, 200 n. 5 (Bankr. D. Idaho 2000) (citing *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992)). Again, the creditor need only prove an exception to discharge by a preponderance of the evidence. *Id.* (citing *Grogan*, 498 U.S. at 291).

### 2.   Proof of an enforceable claim, and standing

Under § 727(c)(1), only "[t]he trustee, *a creditor*, or the United States trustee may object to the granting of a discharge[.]" (emphasis added). This requires proof that Plaintiff has creditor status as a precondition for such relief. Similarly, only creditors may seek a determination of nondischargeability under

MEMORANDUM OF DECISION - 24

the provisions of § 523(a). *See Banks v. Gill Distribution Ctrs., Inc. (In re Banks)*,

263 F.3d 862, 868 (9th Cir. 2001) (holding "there are two distinct issues to

consider in the dischargeability analysis: first, the establishment of the debt itself"

and, second, the nature of the debt); *State of Idaho, Dep't of Fin. v. McClung (In re

McClung)*, 304 B.R. 419, 421-22, 04.1 I.B.C.R. 11, 12 (Bankr. D. Idaho 2004)

(holding § 523(a)(2), (a)(4) and (a)(6) require creditor status to pursue

nondischargeability based on the plain language of the Code).[30]

The threshold question is whether Plaintiff has standing as Debtors' creditor

to pursue the § 727(a) and § 523(a) causes of action. Debtors have directly and

unambiguously attacked such standing. The Court concludes Plaintiff has not

established by a preponderance of the evidence she is a creditor.[31]

### a.    That Plaintiff's claim was scheduled by Debtors is not determinative

Debtors, in their bankruptcy schedules, listed Plaintiff's claim as a breach of

contract claim in an unknown amount. *See* Case No. 03-04278-TLM, Doc. No. 6

at schedule F. Debtors indicated the claim was unliquidated but not that it was

disputed. *Id.* A debtor's schedules and similar submissions made under penalty of

---

[30] The § 523(a) analysis starts with the need to prove a "debt" which § 101(12) defines as a liability on a claim. A claim is defined in § 101(5). An entity holding a claim is a "creditor" under § 101(10). *Id.; see also In re Cross*, 218 B.R. 76, 78 (9th Cir. BAP 1998). Thus, the standard of creditor standing is similar for § 523(a) and § 727(a) actions.

[31] The Court reached a contrary conclusion at the time of the Fed. R. Civ. P. 52(c) motion. Plaintiff's alleged "conversion" claim was the basis of that prior ruling. It is addressed in more detail below.

MEMORANDUM OF DECISION - 25

perjury are subject to treatment as admissions under Fed. R. Evid. 801(d).  *In re Webb*, 03.1 I.B.C.R. 25, 26 (Bankr. D. Idaho 2003).

Plaintiff thereafter filed an original proof of claim on June 28, 2004 asserting an unsecured claim of $1,000,000.00.  A filed proof of claim provides prima facie evidence of its validity and amount.  Fed. R. Bankr. P. 3001(f).

However, the effect of the scheduling and the effect of filing the proof give way to the claim adjudication process of the Code itself.  Under § 501(a) a creditor may file a proof of claim.  Under § 502(a), such a filed claim is deemed allowed unless a party in interest objects.  Under § 502(b), if an objection is made, the Court shall determine the amount of the claim, and allow it except to the extent it is, *inter alia*, unenforceable against the debtor under applicable law.  *See* § 502(b)(1).  Debtors objected to the proof of claim on January 30, 2006.  Doc. No. 103; *see also* Fed. R. Bankr. P. 3007.[32]

The burdens of claim litigation were summarized by this Court in *In re Blackstone*, 269 B.R. 699, 01.4 I.B.C.R. 135 (Bankr. D. Idaho 2001):

> A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a) and constitutes "*prima facie* evidence of the validity and the amount of the claim" pursuant to Bankruptcy Rule 3001(f).  *See also* Fed. R. Bankr. P. 3007.  The filing of an objection to

---

[32] The objection came late in the litigation process, which started two years earlier. However, there is no time bar on an objection to a claim other than the closing of an estate.  *See In re Barton*, 249 B.R. 561, 565 (Bankr. E.D. Wash. 2000) (noting there is no provision in the Code that imposes a deadline for filing objections to claims).  The objection also indicated the question of allowance of the claim would be tried in the instant adversary proceeding.  Plaintiff did not object to this approach.

MEMORANDUM OF DECISION - 26

a proof of claim "creates a dispute which is a contested matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a motion for relief. *See* Adv. Comm. Notes to Fed. R. Bankr. P. 9014.

Upon objection, the proof of claim provides "some evidence as to its validity and amount" and is "strong enough to carry over a mere formal objection without more." *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991) (quoting 3 L. King, Collier on Bankruptcy § 502.2, at 502-22 (15th ed. 1991)); *see also Ashford v. Consolidated Pioneer Mort. (In re Consol. Pioneer Mort.)*, 178 B.R. 222, 226 (9th Cir. BAP 1995), aff'd, 91 F.3d 151, 1996 WL 393533 (9th Cir. 1996).

To defeat the claim, the objector must come forward with sufficient evidence and "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *In re Holm*, 931 F.2d at 623.

. . .

"If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by the preponderance of the evidence." *In re Consol. Pioneer*, 178 B.R. at 226 (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992)). The ultimate burden of persuasion remains at all times upon the claimant. *In re Holm*, 931 F.2d at 623.

269 B.R. at 703, 01.4 I.B.C.R. at 136 (quoting *Lundell v. Anchor Constr.*

*Specialist, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000)).

Debtors presented sufficient evidence to place the burden back on Plaintiff

to prove her claim in the instant adversary.

### b.   The oral agreement between Plaintiff and Ryan

Plaintiff first contends she is a creditor based on the oral agreement with

Ryan.  Therefore, the Court must determine whether an enforceable contract exists.

MEMORANDUM OF DECISION - 27

Though determinations under §§ 523(a) and 727(a) are questions of federal law, the validity of a creditor's claim is determined by state law. *Grogan*, 498 U.S. at 283-84; *In re Cross*, 218 B.R. 76, 78 (9th Cir. BAP 1998) (following *Butner v. United States*, 440 U.S. 48 (1979)).

Under Idaho state law, the inquiry into an alleged oral agreement is three-fold: (1) whether an agreement exists; (2) the terms of the agreement; and (3) construing the agreement for its intended legal effect. *Elec. Wholesale Supply Co. v. Nielson*, 41 P.3d 242, 251 (Idaho 2001) (citing *Bischoff v. Quong-Watkins Props.*, 748 P.2d 410, 412 (Idaho Ct. App. 1987)).

For a contract to be enforceable, it must be "complete, definite and certain" in all its material terms. *Gen. Auto Parts Co. v. Genuine Parts Co.*, 979 P.2d 1207, 1215 (Idaho 1999). Idaho courts do not require absolute certainty relative to every detail of a contract, but "reasonable certainty" is necessary before the contract will be given legal effect. *Id.* (citing *Barnes v. Huck*, 540 P.2d 1352, 1357 (Idaho 1975)). A respected treatise notes it is not enough that parties have actually agreed "if their expressions are not such that the court can determine what the terms of the agreement are." Arthur L. Corbin, Corbin on Contracts § 95 at 143 (One Volume ed. 1952).

At least two material terms were never agreed upon: the extent of Ryan's financial assistance and the rate of Plaintiff's commission.

Ryan appears, by his conduct and the weight of the evidence, to have been

MEMORANDUM OF DECISION - 28

willing under this arrangement to pay some significant portion of Plaintiff's operating expenses. Which expenses, by type or aggregate amount, was unclear. He certainly insists this assistance never included paying one of Plaintiff's primary expenses, the $10,000.00 autodialer installments, even though he ultimately paid two of them anyway.

The duration of the assistance is also vague. Ryan testified he never stated how long he would "help." Conversely, Plaintiff and Hamilton (and Winn in his affidavit) testified Ryan agreed to bankroll Satellite Connections for three months.

Ryan did in fact advance funds to cover Plaintiff's expenses for about three months. But from the beginning, Ryan pressed Plaintiff to set up her own business. Ryan's motivation to continue paying Plaintiff's expenses appears to stem from his belief the autodialer could become profitable, rather than from any firm obligation to finance Plaintiff's business for a set period of time. Plaintiff argues Ryan kept covering her costs because the autodialer was, within weeks, already reaping huge profits, though this proposition was unproven.

The amount of Plaintiff's commission under this oral agreement was also a hotly contested issue. The financial statement prepared for Plaintiff's SBA loan indicates a $50.00 commission. Plaintiff and Hamilton endorsed this document, as Ryan apparently did in agreeing to co-sign the application. However, the ledger attached to Hamilton's state court affidavit suggests Plaintiff started out with a $30.00 commission, which was later raised to $40.00. Hamilton further stated in

MEMORANDUM OF DECISION - 29

her state court affidavit that Plaintiff's commission started at $30.00.  She later

changed her testimony, saying at the instant trial Plaintiff's commission rate was

$50.00.  Ryan maintains Plaintiff's commission started at $30.00, before he raised

it to $40.00, when his own earned commission also increased.  There is, of course,

a significant difference between $30.00 per sale and $50.00 per sale.[33]

Because the extent and duration of Ryan's financial assistance and

Plaintiff's rate of commission are material terms, the Court finds the parties failed

to reach a final, sufficiently clear agreement.  Therefore, no enforceable contract

existed between Plaintiff and Debtors.  Plaintiff has failed to show a creditor status

on this basis.[34]

---

[33] Using the sales shown in Ex. D at internal Ex. B as an example (*i.e.*, 1,264), the difference winds up being close to $25,000.00.  Using Plaintiff's assertion of 150 sales per week, or 1,950 total sales (13 weeks at 150 per week), the difference between $50.00 per sale and $30.00 per sale amounts to $39,000.00.  Using Hamilton's 98% estimate, or Plaintiff counsel's estimate produces an even bigger disparity.

[34] The Court also finds the facts of this case do not establish a joint venture between Plaintiff and A-1.  There was no joint property interest in or joint-ownership of Satellite Connections or the autodialer.  Accordingly, there was no joint control of the new business.  Ryan made it clear he wanted Satellite Connections to become a stand alone entity, and Plaintiff testified to her eagerness to grow *her* business.  Plaintiff concedes the latter fact in her post-trial briefing.  Adv. Doc. No. 60 at 12 ("Karen Rasmussen established her own sales business using the autodialer.").  Plaintiff also concedes she and Ryan did not form a partnership.  *Id*. at 9 ("Karen Rasmussen's relationship was certainly not a simple partnership."); *see* Idaho Code § 53-3-101(8) (defining "partnership" as an association of two or more persons to carry on as *co-owners* a business for profit) (emphasis added); *see also Rhodes v. Sunshine Mining Co.*, 742 P.2d 417, 420-21 (Idaho 1987) (listing factors needed to create joint venture, including mutual control or management of enterprise).  Furthermore, the Idaho Supreme Court has held the intent of the parties is controlling when deciding whether a joint venture exists (although the legal intent controls as to third parties).  *Rhodes*, 742 P.2d at 421-22.  Based on the testimony and conduct of the parties, the Court concludes Plaintiff and Ryan did not intend, nor actually form, a joint venture.

MEMORANDUM OF DECISION - 30

### c. *Quantum meruit* **and unjust enrichment**

Where a contract is deemed unenforceable, a party may still recover under theories of *quantum meruit* or unjust enrichment. *See, e.g., Barry v. Pac. West Constr.*, 103 P.3d 440 (Idaho 2004). Idaho courts carefully differentiate between the measure of recovery under the two theories. *Id*. at 447.

*Quantum meruit*, or a contract implied in fact, is the proper recovery when there is no enforceable express agreement but the parties' conduct evidences an agreement. *Id*. Unjust enrichment is defined as "the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected." Black's Law Dictionary 1573 (8th ed. 2004). It "is not a contract at all, but an obligation imposed by law for the purpose of bringing about justice and equity without reference to the intent of the agreement of the parties, and, in some cases, in spite of an agreement between the parties." *Barry,* 103 P.3d at 447 (quoting *Peavey v. Pellandini*, 551 P.2d 610, 613 (Idaho 1976)).

The amount recoverable in *quantum merit* is the reasonable value of the goods or labor provided, whereas recovery for unjust enrichment focuses on the benefit realized and retained by the defendant as a result of the actions of the plaintiff. 66 Am. Jur.2d § 40 (2001); *Barry,* 103 P.3d at 447.

Plaintiff concedes Ryan paid out more than $91,600.00 to cover Satellite Connections' costs. Adv. Doc. No. 60 at 3. The autodialer records credit Plaintiff

MEMORANDUM OF DECISION - 31

with 1,264 installed sales between early October and late December.  Based on the

contentions of the parties, Plaintiff would be paid anywhere from $30.00 to $50.00

per installed sale.  Even under the $50.00 commission rate, Plaintiff generated

only $63,200.00 in revenues for Satellite Connections, far less than the $91,649.00

in covered expenses.  The evidence does not support a *quantum meruit* recovery

by Plaintiff.

Similarly, Ryan was not unjustly enriched.  Even Plaintiff does not assert

that Ryan was obligated to pay her any part of any commissions he made in excess

of $50.00 per sale.  Accordingly, there is no "unjust" enrichment involved.[35]

Plaintiff has failed to prove a creditor claim based on *quantum meruit* or

unjust enrichment.

### d.    Conversion claim

Plaintiff also contends Debtors converted her autodialer and related

equipment.  *Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605 (Idaho 1999),

establishes the elements of this cause:

> Generally, conversion is defined as a distinct act of dominion
> wrongfully asserted over another's personal property in denial of or
> inconsistent with rights therein.  *See Luzar v. Western Sur. Co.*, 107
> Idaho 693, 696, 692 P.2d 337, 340 (1984).  A right of action accrues
> in favor of the owner of property as soon as the property is wrongfully

---

[35]  To get to a net recovery, Plaintiff had to essentially prove (a) the $91,649.00 in
expenses paid by Ryan was overstated and she should not be obligated for some identifiable
portion of those expenses, or (b) the actual sales were higher than A-1 admitted.  She focused on
the argument that total sales were significantly higher than the 1,294 Ryan admitted.  Her higher
estimates were not proven.

MEMORANDUM OF DECISION - 32

taken from his possession or wrongfully converted. *See Davidson v. Davidson*, 68 Idaho 58, 63, 188 P.2d 329, 332 (1948).

. . .

[W]here there has been a positive act of dominion over another's property, unauthorized by the owner, it is not necessary that the actor intend to commit a trespass or a conversion. *See Wiseman v. Schaffer*, 115 Idaho 537, 540-41, 768 P.2d 800, 803-04 (Ct. App. 1989). An actor may be liable where he has in fact exercised dominion or control, although he may be quite unaware of existence of rights with which he interferes, and a defendant's intention, good or bad faith, and his knowledge or mistake are immaterial. *See Carver v. Ketchum*, 53 Idaho 595, 601, 26 P.2d 139, 141 (1933).

*Peasley*, 979 P.2d at 616; *see also Torix v. Allred*, 606 P.2d 1334, 1339 (Idaho 1980). The Restatement (Second) of Torts § 222A (1965), defines conversion as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Idaho courts have validated use of the Restatement in the conversion context. *See*, *e.g.*, *Luzar*, 692 at 340.

Plaintiff admits she left her office following the December 18, 2000, confrontation with Ryan to consult with an attorney. When she returned, the autodialer and equipment were gone. Therefore, she has no first-hand knowledge as to who may have taken it. Plaintiff relies solely on Hamilton's testimony that Ryan ordered Plaintiff's employees to move the equipment, and themselves, to A-1's nearby offices.

Ryan claims he contacted Levy after the confrontation with Plaintiff, and

MEMORANDUM OF DECISION - 33

told Levy he would not front the December autodialer payment.  At some point

after that (how soon after is unclear) Levy came and took the autodialer.  Ryan's

account is sketchy, but bolstered by the fact that Plaintiff had her attorney draft a

letter, dated December 19, 2000 and addressed to Levy, regarding his seizure of

the equipment and demanding its return.  Just days later, Ryan testified he was

present at a meeting in which Plaintiff and Winn tried to negotiate the return of the

equipment from Levy.  Plaintiff did not deny this meeting took place, nor

contradict the gist of the discussion.  Then, in March, 2001, Plaintiff testified in

her state court affidavit Levy took the autodialer.  Ex. A at ¶ 18.

Ryan never persuasively explained how the equipment came to be moved

immediately after Plaintiff left the site on December 18, 2000.[36]  However,

Plaintiff's own actions following the December 18, 2000 confrontation – her

accusations against Levy, not Ryan – do not support her contention that Ryan

converted her autodialer.  And, Plaintiff's reliance on Hamilton's testimony is

problematic given the former bookkeeper's credibility problems.  Furthermore,

Ryan's testimony that he and Levy immediately engaged in negotiations for

Ryan's purchase of the autodialer - which would explain why Ryan had

possession of the equipment so soon after the confrontation with Plaintiff - was

never contradicted or impeached.

---

[36] Even Debtors' briefing focuses more on Hamilton's lack of credibility and Plaintiff's
lack of evidence than it does on Ryan's own testimony.  Debtors' reliance on Ryan's version of
events is tepid at best.

MEMORANDUM OF DECISION - 34

At the time of the Fed. R. Civ. P. 52(c) motion, and on the evidence introduced on February 9, a conversion claim in the amount of $50,000.00 was presented and the Court so found and refused to stop the trial at that point. At the close of trial, however, the Court is required to evaluate all the evidence, pro and con, and all the inferences to be drawn from that evidence, related to this issue. The facts addressed here, including the December 19, 2000 demand letter on Levy, the subsequent meeting at the Texaco station, and the state court affidavit Plaintiff executed and filed in March, 2001, all weigh against Plaintiff. Accordingly , Plaintiff has not proven by a preponderance of the evidence a claim against Debtors for conversion of her property.[37]

## IV.    CONCLUSION

Plaintiff has not established, by a preponderance of the evidence, that she holds a claim. She therefore lacks the requisite standing as a creditor of Debtors to urge denial of discharge under § 727(a) or to assert a debt should be exempt from discharge under § 523(a). The Court therefore need not address the legal issues

---

[37] The lack of a cognizable conversion claim defeats Plaintiff's contentions of lost profits and consequential damages. Plaintiff did not negate the evidence regarding Levy's sale of the equipment to Ryan. Ryan's use of the autodialer after that sale invades no right of Plaintiff. Though Plaintiff may have a claim against Levy, that is not at issue in this litigation.

In addition, Plaintiff's claim based on intentional interference with business relations (advanced in her post-trial brief for the first time) was predicated on Ryan's alleged conversion of the autodialer and withholding of commissions. As Plaintiff has not proven by a preponderance of the evidence that Debtors converted the autodialer or withheld commissions belonging to her, her claim for intentional interference with business relations also fails.

MEMORANDUM OF DECISION - 35

under either.

Debtors' objection to Plaintiff's claim in the main case will therefore be sustained and the claim will be disallowed.  An order will be entered accordingly. Plaintiff's complaint in this adversary proceeding must be dismissed as to both Debtors.  An appropriate judgment will be entered.

DATED:  March 30, 2006

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 36